UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JOANNE RIDDLE                              )
f/k/a JOANNE MOYER,                        )
                                           )
            Plaintiff,                     )
                                           )       No. 2:06-0004
v.                                         )       Nixon/Knowles
                                           )
MICHAEL J. ASTRUE                          )
Commissioner of Social Security,           )
                                           )
            Defendant.                     )

## REPORT AND RECOMMENDATION

This action was brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to obtain judicial

review of the final decision of the Social Security Administration (the Agency), through its

Commissioner, denying the plaintiff's applications for disability insurance benefits (DIB) and

supplemental security income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C.

§§ 401 *et seq* ; 1381 *et seq* . For the reasons explained below, the undersigned **RECOMMENDS**

that the plaintiff's motion for judgment on the administrative record[1] be **DENIED**, and that the

Commissioner's decision be **AFFIRMED**.

## I. PROCEDURAL HISTORY

The plaintiff protectively filed applications for DIB and SSI on February 19, 2001. (Docket

Entry No. 7, pp. 238-240, 600-602) The plaintiff's claims were denied on August 23, 2001, and her

request for reconsideration was denied on January 18, 2002. (Docket Entry No. 7, pp. 214-228, 599-

611) The plaintiff requested a hearing before an Administrative Law Judge (ALJ) on September 21,

---

[1] The undersigned directed the plaintiff to file a motion for judgment on the administrative record. (Docket
Entry No. 9, pp. 1, 4) The undersigned construes/refers to the plaintiff's motion for summary judgment throughout as
one for judgment on the administrative record.

2001 (Docket Entry No 7, pp. 229-230)

A hearing was held on November 4, 2003. (Docket Entry No 7, pp. 612-649) In his January 23, 2004 decision (Docket Entry No. 7, pp 55-64), the ALJ – Robert C. Haynes – determined that the plaintiff was "not entitled to a period of disability or disability insurance benefits," nor was she "eligible for supplemental security income    ." (Docket Entry No 7, p 64)

On March 10, 2004, the plaintiff asked the Social Security Appeals Council (the Appeals Council) to review the ALJ's decision (Docket Entry No 7, p 65) On April 16, 2004, during the pendency of her appeal, the plaintiff filed a second claim for DIB, with a protective filing date of March 17, 2004. (Docket Entry No. 7, pp. 19, 73-88) She filed a second claim for SSI on April 19, 2004, also with a protective filing date of March 17, 2004. (Docket Entry No 7, pp 19, 73-88)

The Appeals Council vacated the ALJ's decision on June 10, 2004, and remanded matter for further proceedings with instructions (Docket Entry No. 7, pp 67-69) The hearing on remand was held on December 6, 2004, in which all of the plaintiff's claims were consolidated. (Docket Entry No 7, pp 19, 650-668)

On remand, the ALJ – Douglas J. Kile – made the following enumerated findings in his May 12, 2005 decision:

1. The claimant met the disability insured status requirements of the Act on February 19, 2001, the date the claimant stated she became unable to work, and continues to meet them through December 31, 2006.

2. The claimant has not engaged in substantial gainful activity since February 19, 2001.

3. The medical evidence establishes that the claimant has severe impairments including depression, anxiety, borderline personality disorder, chronic obstructive pulmonary disease, fibromyalgia, chronic fatigue syndrome, but that she does not have an impairment or combination of impairments listed in, or medically equal to one

2

listed in appendix 1, Subpart P, Regulations No. 4

4. The claimant's subjective complaints are not credible to the extent alleged.

5. The claimant has the residual functional capacity to perform work-related activities except for the following limitations: lifting a maximum of twenty pounds occasionally and ten pounds frequently; standing and/or walking about six hours in an eight hour workday; sitting about six hours in an eight hour workday and the additional restrictions set forth in the body of this decision.

6. The claimant has moderate limitation in the activities of daily living; mild to moderate limitation in social functioning; mild to moderate limitation in concentration, persistence, or pace; and no episodes of decompensation

7. The claimant is unable to perform her past relevant work as a secretary, auditor, communications manager, loss prevention clerk, cashier, sales coordinator and receptionist

8. The claimant's residual functional capacity for the full range of light work is reduced by the limitations described in Finding No. 5.

9. The claimant is 54 years old, which is defined as approaching advanced age.

10. The claimant has a high school education, with two years of college.

11. In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

12. If the claimant retained the residual functional capacity for the full range of light work, Rule 202.14 or 202.15 would apply. They all direct a finding of not disabled.

13. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using the above-cited rule(s) as a framework for decision making, there are a significant number of jobs in the national economy which the [sic] she could perform Examples of such jobs are photocopy machine operator, laundry classifier and sorter. There are over 4600 such jobs in the regional economy and over 190,000 in the nation. There are no discrepancies between the vocational expert's testimony regarding these jobs and

3

the Dictionary of Occupational Titles

14      Considering the whole of this evidence, in light of the claimant's
        limitations and using the above cited rules as a framework, it is clear
        that the claimant remains capable of performing jobs which exist in
        significant numbers in the national economy

15.     The claimant was not under a disability as defined in the Social
        Security Act, at any time through the date of this decision.

(Docket Entry No. 7, pp. 25-27)(internal citations omitted). Based on the foregoing, the ALJ

determined that the plaintiff was not "entitle[d] to a period of disability or disability insurance

benefits . . . ," or to "supplemental security benefits . . . " based on her initial disability claims.

(Docket Entry No. 7, p. 27). The ALJ also determined that the plaintiff was "not disabled on the

basis of the subsequent applications filed April 16, 2004 and April 19, 2004." (Docket Entry No. 7,

p. 27)

       On May 20, 2005, the plaintiff again asked the Appeals Council to review the ALJ's decision.

(Docket Entry No. 7, pp. 14-15). The Appeals Council denied the plaintiff's request for review on

November 10, 2005 (Docket Entry No. 7, pp. 8-10), thereby rendering the ALJ's determination the

Social Security Administration's final decision.

       The plaintiff brought this action in the district court on January 9, 2006, following which the

defendant filed an answer on March 21, 2006. (Docket Entry No. 1, 8). Thereafter, on April 28,

2006, the plaintiff filed a motion for judgment on the administrative record. (Docket Entry No. 11-

12). The plaintiff raises the following "issues" (claims of error) in her motion:

       1.      Whether the Commissioner erred as a matter of law in failing to
               understand the true nature of fibromyalgia, and the fact that it can
               form the basis of a disability claim, even in the absence of objective
               findings.

       2.      Whether the Commissioner erred as a matter of law in failing to

4

accord adequate weight to the opinions and assessment of the plaintiff's treating physicians

3. Whether the Commissioner erred as a matter of law in failing to consider the effect of the plaintiff's fatigue, muscle aches, pain, memory loss, and other symptoms of fibromyalgia on her ability to work

4. Whether the Commissioner erred as a matter of law in failing to comply with the Appeals Council's June 22, 2004 order of remand

(Docket Entry No. 12, pp. 1-2) The plaintiff asks the district court to reverse the Commissioner's decision, and to remand the matter to the Commissioner with instructions to award benefits to the plaintiff or, in the alternative, to remand the matter to the Commissioner with instructions to properly evaluate the plaintiff's fibromyalgia (Docket Entry No. 12, p. 38)

The defendant filed a response in opposition to the plaintiff's motion on August 15, 2006. (Docket Entry No. 20) The defendant argues that the Court should affirm the Commissioner's decision that the plaintiff is not disabled within the meaning of the Social Security Act (Docket Entry No. 20, p. 18) This matter is now properly before the Court.

## II. ANALYSIS

### A. Standard of Review

The district court reviews the Commissioner's final decision to determine whether the Commissioner's findings of fact are supported by substantial evidence in the record, and whether the correct legal standards were applied. *Elam ex rel Golay v Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v Comm'r of Soc Sec*, 486 F.3d 234, 241 (6th Cir 2007)(quoting *Cutlip v Sec'y of Health & Human Servs*, 25 F.3d 284, 286 (6th Cir 1994)). Even if the evidence

5

could also support a different conclusion, the Agency's decision must stand if substantial evidence supports the conclusion reached. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999). In other words, if the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. 42 U.S.C. §§ 405(g), 1383(c)

## B. Analysis of the Record

### 1. December 6, 2004 Hearing on Remand

#### a. Plaintiff's Testimony

The plaintiff testified that she had held several jobs in the years prior to filing her DIB and SSI claims. (Docket Entry No. 7, pp. 652-656) The plaintiff described the requirements of those jobs generally as involving 2 to 6 hours sitting, 2 to 8 hours standing/walking, and lifting 10 to 20 pounds. (Docket Entry No. 7, pp. 652-656)

According to the plaintiff, she began to experience the effects of fibromyalgia after a car accident in 1996. (Docket Entry No. 7, p. 656) She testified that the fibromyalgia caused "muscle spasms," and prevented her from "hang[ing] on to things in a long period of time . . . " (Docket Entry No. 7, p. 656) She also testified that her pain was a "really bad," "[b]urning type pain" that she experienced "every day," that the pain increased with activity, and that after 15 to 20 minutes, she was unable to do anything. (Docket Entry No. 7, p. 656) On a scale of 1 to 10, the plaintiff ranked her pain on as 5-6 on an average day, but that it increased to 7-8 after activity. (Docket Entry No. 7, p. 658) The plaintiff testified that she experienced a "bad day" about once a week, when the pain was 8-9, but that the number of bad days increased when the weather was cold. (Docket Entry No. 7, p. 658)

The plaintiff also testified that she suffered from chronic fatigue that began to bother her in

6

either 1999 or 2000. (Docket Entry No. 7, p. 657) According to the plaintiff, she had to take a nap when she became tired, but she felt better sitting. (Docket Entry No. 7, p. 657) The plaintiff testified that she became depressed and anxious after her ex-husband's attempted suicide in 1998. (Docket entry No. 7, p. 657) She testified further that she had problems completing projects or tasks around the home because of depression, rather than fibromyalgia or chronic fatigue. (Docket Entry No. 7, p. 657) After testifying that she experienced side effects from her medication, the plaintiff testified that she had a computer and accessed the internet a "couple of times a week," that she ran a "[c]ouple of short errands every day," that she was able to drive, that she did "light housework," that she went grocery shopping once a week, and that after she shopped for groceries, she and her mother would go on a "two hour excursion." (Docket Entry No. 7, p. 659)

The ALJ's questions pertained, for the most part, to any employment that the plaintiff might have had since she filed her claims, and any income/benefits that she might have received since then. (Docket Entry No. 7, pp. 659-660) The ALJ established that the plaintiff drove to the hearing, that her average weight during the period at issue was 110 pounds, that she smoked occasionally, and that she did not drink. (Docket Entry No. 7, pp. 660-661)

### b. Vocational Expert's Testimony

Vocational Expert Edward Smith was asked at the hearing to evaluate the "exertional level" and "skill level" of each job that the plaintiff had held in the last fifteen years. (Docket Entry No. 7, p. 662) The vocational expert testified that the "exertional level" of the plaintiff's jobs ranged from sedentary to light, and that the "skill level" for her jobs fell into the category of "semi-skilled." (Docket Entry No. 7, p. 662)

Following the vocational expert's testimony that the plaintiff's skills had a "high degree of

7

transferability . . at the light variety [of work] to clerk position[s] a[t] the sedentary level" (Docket

Entry No. 7, p. 663), the ALJ posed the following hypothetical:

> Assume that I find on the basis of the credible record before me, the claimant's demonstrated exertional impairments [INAUDIBLE] for a wide range of light work on a sustained basis. Assume [INAUDIBLE] she's demonstrated certain non-exertional impairments the entire rating of fibromyalgia, mental depression, mental anxiety, osteoporosis, gastrointestinal disorder, osteoarthritis, gastrointestinal disorder, border-line personality disorder. [INAUDIBLE] an inability to handle excessive operations, inability to perform frequent bending and stooping, inability to form [sic] frequent squatting, and an inability to handle frequent contact with the general public. Take into both accounts the non-exertional claimant's age, education, and prior level work experiences, are there jobs existing in [INAUDIBLE]

(Docket Entry No. 7, p. 663) The vocational expert responded to the ALJ's hypothetical, testifying

that such person could work: 1) as a "photocopier machine operator," of which there were 800 jobs

locally, and 20,000 nationally; 2) a laundry classifier, of which there were 2,227 jobs locally, and

85,974 nationally; and 3) as a sorter, of which there were 1,592 such jobs locally, 86,905 nationally.

(Docket Entry No. 7, p. 663) The vocational expert also testified that "an inability to learn,

understand, and carry out more than simple job descriptions" would not have any effect on the ability

to perform the jobs listed above. (Docket Entry No. 7, p. 664)

In response to the ALJ's further questions, the vocational expert testified that: 1) the need

to lie down, rest, or absent herself from her work beyond acceptable monthly absences, authorized

breaks, and lunch time would prevent the plaintiff from holding any of the jobs identified; 2) a "mild

decrease of hand" grip would not affect the plaintiff's ability to perform any of the jobs identified;

3) "mild restrictions of bilateral manual dexterity" would not affect the plaintiff's ability to perform

any of the jobs identified; 4) "an inability to tolerate high humidity levels" would not affect the

8

ability to perform any of the jobs identified; 5) a "stand/sit work option" would prevent the plaintiff from doing any of the jobs identified; 6) the plaintiff could not return to her previous employment; 7) slight to moderate pain would not affect the plaintiff's ability to perform any of the jobs identified; 8) severe pain would prevent the plaintiff from doing any of the jobs identified; 9) slight to moderate "fatiguability" would not prevent the plaintiff from performing any of the jobs identified; 10) severe fatiguability would prevent the plaintiff from performing any of the jobs identified; 11) "[b]ased on [the plaintiff's] testimony, the level of pain and the degree of fatiguability would just by themselves . . . preclude her" from doing the jobs identified; and 12) based on the plaintiff's testimony at the hearing, there were no jobs that the plaintiff could perform. (Docket Entry No. 7, pp. 665-667)

## 2. ALJ's Analysis of the Record

In proceedings before the Social Security Administration, the claimant's case is considered under a five-step sequential evaluation process. The process is "sequential" because the process ceases at the first step where a finding of disabled or not disabled is made. *Mowery v. Heckler*, 771 F.2d 966, 969 (6th Cir. 1985). The five-step process is as follows:

1. A determination must be made to determine whether the claimant is engaged in substantial gainful activity. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of the medical findings.

2. If the claimant is not engaging in substantial gainful activity, then it must be determined whether the claimant suffers from a severe impairment. A claimant who does not have a severe impairment will not be found to be disabled.

3. If a claimant suffers from a severe impairment, then it must be determined whether the claimant's impairment meets or exceeds those listed in 20 CFR § 404, SubPart P, Appendix 1. If the claimant's impairment is a listed impairment, then the claim for benefits is allowed. If the claimant's severe impairment is not a listed

9

impairment, then the assessment proceeds to step four.

4.   In those cases where a claimant's severe impairment is not among the listed impairments, it must be determined whether the claimant has the residual functional capacity (RFC) to perform past relevant work. A claimant who can perform past relevant will not be found disabled, and the inquiry proceeds to step five.

5.   If a claimant cannot perform past relevant work, then it must be determined whether the claimant can perform a significant number of other jobs, taking such factors as age, education, and work experience into consideration. If there are a significant number of other jobs that the claimant can do, then the claimant will not be found to be disabled. If the claimant's RFC precludes such employment, then benefits will be granted.

20 CFR §§ 404.1520(a)(4); 416 920(a)(4); *see Cruse v. Commissioner*, 502 F.3d 532, 539 (6th Cir. 2007)(collecting cases). The claimant bears the burden of proof in steps one through four. *Jones v. Commissioner*, 336 F.3d 469, 474 (6th Cir. 2003). The burden of proof shifts to the Agency in step five. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As shown below, the ALJ followed the five-step process.

### a. Steps One

The ALJ determined at the first step that the claimant had not engaged in substantial gainful activity since February 19, 2001. (Docket Entry No. 7, p. 20 & ¶ 2, p. 25)

### b. Step Two

The ALJ determined at the second step that the plaintiff had "severe impairments including depression, anxiety, borderline personality disorder, chronic obstructive pulmonary disease, fibromyalgia, [and] chronic fatigue syndrome, which affect her ability to work." (Docket Entry No 7, p. 20 & ¶ 3, p. 26)

10

### c. Step Three

The ALJ determined at the third step that the "claimant's impairments do not, singly or in combination, meet or equal any of the listings." (Docket Entry No. 7, p. 20 & ¶ 3, p. 26) Fibromyalgia is not a listed impairment. *See Bartyzel v. Commissioner of social Security*, 74 Fed.Appx. 515, 526 (6th Cir. 2003).

### d. Step Four

The ALJ determined at the fourth step that "the claimant's residual functional capacity preclude[d] a return to her past relevant work." (Docket Entry No. 7, p. 25 & ¶ 7, p. 26)

### e. Step Five

Noting that the "claimant asserts that she is disabled and unable to work primarily because of chronic pain and depression" (Docket Entry No, 7, p. 20), the ALJ applied the two-part test in 20 CFR §§ 404.1529 and 416.929, as clarified in *Social Security Ruling* (SSR) 96-7p. The purpose of SSR 96-7p is to:

> clarify when the evaluation of symptoms, including pain, under 20 CFR 1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptoms(s) and its functional effects; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision

*Id.* at p. 1

Under SSR 96-7p, the ALJ must determine first "whether there is an underlying medically determinable physical or mental impairment." *Id.* at p. 2. If there is, then the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* This two-part

11

test is applicable to credibility determinations pertaining to claims of disability due to fibromyalgia.
*See e g , Rogers*, 486 F.3d at 248. In *Rogers*, the Sixth Circuit noted that:

> [B]lanket assertions that the claimant is not believable will not pass
> muster, nor will explanations as to credibility which are not consistent
> with the entire record and the weight of relevant evidence. And given
> the nature of fibromyalgia, where subjective pain complaints play an
> important role in the diagnosis and treatment of the condition,
> providing justification for discounting a claimant's statements is
> particularly important

*Id.* *(citing Hurst v. Sec'y of Health and Human Servs*, 753 F 2d. 519 (6ᵗʰ Cir. 1985). The ALJ also

noted that the plaintiff's alleged mental impairments must be assessed under 20 CFR §§ 404 1520a

and 1520a(c) (Docket Entry No. 7, p 20)

The ALJ addressed the plaintiff's claims pursuant to, and in accordance with, the authority

cited above. In so doing, the ALJ determined that "[t]he claimants complaints meets the first prong

of the test," *i e* , that "[s]he has medically determinable impairments that could cause such

complaints." (Docket Entry No 7, p. 21) Having determined the first part of the two-part test in the

plaintiff's favor, the ALJ then addressed the intensity, persistence, and limiting effects of the

plaintiff's symptoms in determining the extent to which those affected her ability to work

### (1) Physical Capacity to Work

Addressing the plaintiff's testimony at the hearing, the ALJ noted that her "subjective

complaints [we]re not credible to the extent alleged," because "[a] number of her statements are

inconsistent if not contradictory."[2]   (Docket Entry No. 7, p. 21)   As an example of those

inconsistencies/contradictions, the ALJ noted that the plaintiff claimed that "any activity of any kind

---

[2]   Although the ALJ noted that the plaintiff's "complaints far exceed what could reasonably be expected in light
of the objective findings" (Docket Entry No. 7, p 21), the ALJ did not focus on the absence of objective findings in his
decision

for more than about twenty minutes at a time, exacerbates her pain and fatigue to the extent that she must stop the activity," but that she admitted doing "light housework," "work[ing] on her computer," "r[unning] short errands," and "shopp[ing] for groceries with her mother . . . [which] usually took at least two hours."[3] (Docket Entry No. 7, p. 21) The ALJ noted that each of these activities took more than twenty minutes, the threshold at which the plaintiff claimed that her pain increased to the point that it became unbearable. In a footnote, the ALJ also noted that "[t]he shopping trips contain more prolonged standing, walking and sitting than would be permissible if her complaints were fully credible." (Docket Entry No. 7, p. 21 n. 1)

The ALJ referred to the records of Dr. Tom Jenkins, M.D., who saw the plaintiff on referral during the August-September, 2001 time frame. (Docket Entry No. 7, pp. 509-517) The ALJ noted Dr. Jenkins "comment[] that [the plaintiff] showed 'exaggerated pain behavior' and did not have the 'classic trigger points' for fibromyalgia." (Docket Entry No. 7, pp. 21, 514)

The ALJ referred to the June 4, 2003 consultative examination of Dr. Joseph Johnson, M.D. (Docket Entry No. 7, pp. 549-556) Summarizing the results, the ALJ noted that Dr. Johnson's examination showed that the "claimant was overly dramatic during the examination," that she "intentionally kicked over a stool and 'fell' when asked to get on the examining table,"[4] that he "was unable to accurately assess her ability to function," and that her "activity at the examination was clearly inconsistent with her subjective complaints . . ." (Docket Entry No. 7, pp. 21, 550-551)

---

[3]  The plaintiff actually testified that she and her mother "do grocery shopping once a week . . . and after that probably a two hour excursion." (Docket Entry No. 7, p. 659) Thus, the total shopping-plus-excursion time exceeds two hours.

[4]  Dr. Johnson actually wrote: "When I asked her to get up on the table, she kick[ed] the foot stool out purposefully twice . . . pushe[d] her back on the table against the wall . . . asked me if I'm just going to . . . let her fall . . . She was clearly uninjured despite her controlled fall." (Docket Entry No. 7, pp. 550-551)

13

The ALJ referred to the June 30, 2004 "consultive examination" of the plaintiff by Dr. Jerry Surber, M.D. (Docket Entry No. 7, pp. 145-149) Dr. Surber's assessment was that the plaintiff:

> would be able to occasionally lift up to 10 pounds during up to 1/3 of an 8-hour workday. She would be able to stand or walk with normal breaks up to possibly 4 hours in an 8-hour workday, or sit with normal breaks for up to 6 hours in an 8-hour workday.

(Docket Entry No. 7, p. 149) The ALJ determined that the "limitations exceed[ed] what could reasonably be expected in light of the minimal objective findings." (Docket Entry No. 7, p. 22) The ALJ gave Dr. Suber's assessment "limited weight," because Dr. Suber apparently gave "full credibility to the claimant's complaints and fail[ed] to address the impact of her tendencies to exaggerate."[5] (Docket Entry No. 7, p. 22)

The ALJ did not consider the reports of either Dr. Robert Williams, M.D. (Docket Entry No. 7, pp. 369-387) or Dr. Michael Kaye, D.C. (Docket Entry No. 7, pp. 388-422), because the records "all pertained to a period long before February 19, 2001." (Docket Entry No. 7, p. 22) Although it is somewhat unclear, it also does not appear that the ALJ considered the records of Dr. Daniel Skubick M.D. (Docket Entry No. 7, pp. 423-461) or Dr. Robert Motley, M.D. for the same reason (Docket Entry No. 7, pp. 462-284). (Docket Entry No. 7, p. 22)

The ALJ evaluated the medical records of Dr. Raymond Turek, M.D., a treating physician. The records reviewed by the ALJ included: 1) a Medical Evaluation Report dated June 10, 2004 (Docket Entry No. 7, pp. 142-144); 2) a "Medical Evaluation Report" dated March 15, 2004 with attached clinical notes pertaining to examinations conducted on March 27 and April 22, 2003

---

[5] Dr. Suber's credibility was further undermined because he gave the plaintiff complaints full credence despite noting that she was "uncooperative during the exam," and a "very hesitant historian in terms of relating specifics of her pain and history." (Docket Entry No. 7 pp. 147, 149)

14

(Docket Entry No. 7, pp 172-182); 3) a "Medical Assessment of Ability to do Work-Related Activities" dated October 28, 2002 (Docket Entry No. 7, pp 546-548); 4) a letter to the ALJ dated September 9, 2003 with attached clinical notes pertaining to an examination conducted on April 22, 2003; 5) a "Problem List" dated March 27, 2003; 6) a "History of Physical Examination" dated March 27, 2003; and 7) a medication sheet dated March 27, 2003 (Docket Entry No. 7, pp 557-563).

The ALJ made the following determination subsequent to his review of Dr. Turek's records:

> On October 28, 2002, Dr. Turek essentially opined that claimant has the following limitations: lifting a maximum of less than ten pounds; standing and/or walking less than two hours in an eight-hour workday; sitting less than six hours in an eight-hour workday; and four rest periods/nap per eight-hour workday. On March 27, 2003, he stated the claimant was 'disabled and unemployable'. On March 15, 2004, he essentially opined the claimant has the following limitations: lifting a maximum of ten pounds occasionally and five pounds frequently; standing and/or walking about 1 ½ hours in an eight hour workday; sitting about four hours in an eight hour workday; no stooping or crawling; and significant problems with memory, concentration and persistency because of her depression and anxiety. On October 28, 2002, he asserted the claimant suffers fibromyalgia, 'severe' chronic fatigue syndrome, anxiety neurosis and malnutrition. He reported that the claimant only weighed 98 pounds. However, by March 27, 2003, he noted the claimant weighed 108 pounds. The claimant asserted that her range of motion was restricted in her lower back, knees, elbows and left shoulder. The neurological examination was normal. However, there were no x-rays in his records confirming any significant arthritic changes nor were there any test results (such as EMG testing) supporting his assertion that the claimant had carpal tunnel syndrome.
>
> [Dr. Turek's] statements are conclusory and unaccompanied by detailed treatment records. The limitations he finds are more severe than consistent with the claimant's admitted activity level. For these reasons, his opinions are given little, if any, weight.

(Docket Entry No. 7, p. 22)(Internal references to the record and footnotes omitted)

The ALJ considered the medical opinions of Dr. D. Brad Seitzinger, M.D., another treating

15

physician. (Docket Entry No. 7, pp. 102-111, 193-205, 526-527, 564-571) Dr. Seitzinger's records

show that he treated the plaintiff from September 17, 2001 to July 1, 2004. The ALJ made the

following determinations with respect to his records:

> Dr. Seitzinger, a treating physician, essentially opined in a July 29,
> 2004 assessment the claimant has the following limitations: lifting a
> maximum of less than ten pounds; standing and/or walking less than
> two hours in an eight hour workday; sitting about four hours in an
> eight hour workday; incapable of even 'low stress' jobs; needs a
> break every two to four hours; needs to elevate legs; no climbing,
> balancing, climbing or stooping; occasional kneeling and crouching;
> limited ability to manipulate objects; about four absences do [sic] to
> illness per month; and avoid excessive pulmonary irritants, noise,
> vibration, extremes of humidity or temperature or hazardous
> machinery. While he mentioned fibromyalgia, depression and anxiety
> in his treatment records, with multiple trigger points, there is no
> documentation of impairments reasonably expected to cause
> susceptibility to pulmonary irritants, problems with manipulating
> objects, or sensitivity to noise or vibration. The claimant herself did
> not even allege significant problems with exposure to pulmonary
> irritants, noise, vibration, or extremes of humidity or temperature.
> These limitations found by Dr. Seitzinger exceed what could
> reasonably be expected in light of the minimal objective findings.
> They appear largely based on giving full credibility to the claimant's
> complaints and fail to address the impact of her tendencies to
> exaggerate. Perhaps Dr. Seitzinger is exaggerating their severity in
> a misguided attempt to 'help' his patient. They are not consistent
> with her admitted activity level, such as shopping and housework.
> There were no x-rays in his records confirming any significant
> arthritic changes nor were there any test results (such as EMG testing)
> supporting his assertion that the claimant had carpal tunnel syndrome.
> Therefore, his opinion is given little, if any weight.

(Docket Entry No. 7, pp. 22-23)(Internal references to the record omitted)

The ALJ referred to Dr. Donita Keown, a consulting physician, who reported on July 25,

2001 – five months after the plaintiff filed her disability claim – that the plaintiff:

> is a healthy appearing white female who . moves through the room
> quickly and is very agile, talkative and friendly. She has no problem
> ambulating through the clinic, getting onto or from the examination

16

table."

(Docket Entry No. 7, p. 507) Dr. Keown also noted that the plaintiff had "[f]ull range of motion at the shoulders, elbows, wrists, hands, hips, knees and ankles and without evidence of traditional trigger points." (Docket Entry No. 7, p. 507)

The ALJ referred to the May 20, 2004 examination of the plaintiff by Dr. Darrell Smith, M.D. (Docket Entry No. 7, pp. 188-189) Doctor Smith noted that the plaintiff "retained full range of motion in her joints and had no sensory, reflex or neurological abnormalities . . . [and] did not mention any trigger point tenderness." (Docket Entry No. 7, pp. 23, 188-189)

Based on the greater weight given to the medical observations of Drs. Smith, Keown, Jenkins, and Johnson, than to Drs. Seitzinger and Turek, and the plaintiff's questionable credibility based on her testimony, the ALJ determined that the medical evidence supported the conclusion that the plaintiff had the following physical restrictions that would limit her ability to work:

> lifting a maximum of twenty pounds occasionally and ten pounds frequently; standing and/or walking about six hours in an eight hour workday; sitting about six hours in an eight hour workday; no excessive vibration; no frequent bending, stooping or squatting; no heights or moving machinery; mild decrease in hand grip; mild decrease in bilateral manual dexterity; no high humidity; no extreme cold; mild to moderate pain; and mild to moderate fatiguability

(Docket Entry No. 7, p. 23)

### (2) Psychological Capacity to Work

The ALJ addressed the July 3, 2001 psychological evaluation performed by consulting psychologist Dr. Patsy Ryan, ED.D. (Docket Entry No. 7, pp. 485-488) In her assessment, Dr. Ryan concluded that the plaintiff had "a moderately limited ability to persist at work activities and adapt to changes in the workplace; and a moderately to severe limited ability to deal with the public,

17

coworkers or supervisors." (Docket Entry No. p. 488) In addressing Dr. Ryan's assessment, the ALJ

noted that Dr. Ryan also had determined that the plaintiff's limitations were "temporary and [that]

improvement to a minimum level was expected."[6] (Docket Entry No. 7, pp. 23, 488)

The ALJ next considered the plaintiff's psychological history, noting that she had "a long

history of mental health treatment," but that "her actual treatment records generally reflect only mild

symptoms." (Docket Entry No. 7, p. 23) In assessing her psychological history, the ALJ noted that

the plaintiff's "GAF scores stayed at 65[7] except for two brief periods,"[8] those periods being when

the plaintiff received a GAF score of 50[9] in her September 13, 2001 intake evaluation at the

Volunteer Behavioral Health Care System (Volunteer Health) (Docket Entry No. 7, p. 521), and

scores of 29 and 30[10] during evaluations conducted on May 19-20, 2004 by Volunteer Health and

Peninsula Hospital respectively (Docket Entry No. 7, pp. 122, 185). Based on the foregoing, the ALJ

determined that "Dr. Ryan's opinion indicating moderate to severe limitations [wa]s not well

---

[6] Doctor Ryan actually wrote: "I believe [the plaintiff] is temporarily handicapped due to depression; however, with therapy I believe she could overcome this depression and could probably do most anything that she chose to do." (Docket Entry No. 7, p. 488)

[7] The *Diagnostic and Statistical Manual of Mental Disorders IV*, American Psychiatric Association (4th ed. 1995) cited by the ALJ provides a Global Assessment of Functioning (GAF) Scale that scores individuals in the context of their psychological, social, and occupational ability to function. *Id.* at 32. A GAF score of 65 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), BUT generally functioning pretty well . . ." *Id.* (bold omitted)

[8] The other GAF scores in the record, to which the ALJ referred, all reflected "mild" symptoms on the GAF Scale: 1) on May 3, 2002, Volunteer Health recorded the plaintiff's GAF score as 65 (Docket Entry No. 7, p. 596); 2) on October 22, 2002, Volunteer Health recorded the plaintiff's GAF score as 65 (Docket Entry No. 7, p. 584); 3) on November 5, 2003, Volunteer Health recorded the plaintiff's GAF score as 65 (Docket Entry No. 7, p. 213).

[9] A GAF score of 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends unable to keep a job)." *Id.* (bold omitted)

[10] A GAF score of 29-30 indicates that "[behavior is considerably influenced by delusions or hallucinations OR serious impairments in communication or judgment . . . Or inability to function in almost all areas . . ." *Id.* (bold omitted).

18

supported and [wa]s given little weight." (Docket Entry No. 7, p. 24)

The ALJ considered the July 12, 2001 opinion of the state agency physician, Dr. Larry Welch, Ed.D. (Docket Entry No. 7, 489-505) The ALJ summarized his assessment as follows:

> [T]he claimant had moderate limitation in the activities of daily living; moderate limitation in social functioning; moderate limitation in concentration, persistence, or pace; and no episodes of decompensation. Furthermore, she [*sic*] indicated the claimant had moderately limited ability to: deal with the public; respond appropriately to the changes in the work setting; maintain attention/concentration for extended periods; work in coordination with or proximity to others without being unduly distracted; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workweek without psychologically based interruptions and to perform at a consistent pace without an unreasonable number or length of rest periods.

(Docket Entry No. 7, p. 24) Relying on the plaintiff's history of mental health treatment, discussed above, the ALJ concluded that "[s]uch limitations are inconsistent with the treatment records which confirm a long history of only mild symptoms of exacerbation." (Docket Entry No. 7, p. 24)

The ALJ also considered an employment questionnaire completed by Douglas White on June 14, 2004.[11] (Docket Entry No. 7, pp. 90-92) Mr. White noted in his responses to the questionnaire that: 1) the plaintiff got to work on time most of the time; 2) her attendance was satisfactory; 3) she maintained an ordinary work routine without supervision; 4) she did not require frequent breaks or rest periods for stress related reasons; 5) she was able to understand and carry out simple one- or two-step instructions; 6) she was able to understand and carry out detailed instructions; 7) she was able to ask simple questions and request assistance; and 8) she maintained socially appropriate

---

[11] Mr. White is identified in the questionnaire as "Vice Pres," but the name of the company is not given. Additionally, although Mr. White signed that questionnaire on June 14, 2004, the actual period of time/employment to which Mr. White's responses pertained cannot be determined from either the questionnaire or the record.

behavior and grooming. (Docket Entry No. 7, ¶¶ 1-6, 8, 14, pp. 90-91) On the other hand, Mr. White noted that the plaintiff was: 1) unable to remain attentive and concentrate for extended periods; 2) could not perform tasks at a consistent pace; 3) was unable to make simple work decisions; and 4) was "often" distracted by other employees when working in close proximity to them, but able "to a degree" to work in close proximity to others without distracting them. (Docket Entry No. 7, ¶¶ 9-13, p. 92)

Although Mr. White did not address whether the plaintiff was able to respond to changes in the required work, or whether she took precautions around usual work hazards, he did note that the plaintiff "made a lot of excuses" in her ability to accept instructions and criticisms, and that she "stressed out a[t] small things" in her ability to respond appropriately to the normal stresses associated in performing assigned tasks. (Docket Entry No. 7, p. 92) In addressing Mr. White's remarks, the ALJ determined that:

> [Mr. White] did not indicate he believed that any of these problems were related to impairments. These behaviors could just have easily been the result of conscious choice by the claimant. The facts of the case are generally more consistent with the latter conclusion than a conclusion that they are impairment related.

(Docket Entry No. 7, p. 24)

Based on the foregoing, the ALJ made the following determination with respect to the plaintiff's psychological impairment:

> Given this history, the claimant's questionable credibility, and some of her admitted activities, her only significant, established, mental limitations are: only unskilled work and no frequent contact with the public. This conclusion is fully consistent with the treatment records from Volunteer Behavioral Health Care System. Other than the previously addressed exceptions, there are no contrary opinions from any of the treating or examining sources. These reasons support the additional conclusion that the claimant had moderate limitation in the

20

activities of daily living; mild to moderate limitation in social functioning; mild to moderate limitation in concentration, persistence, or pace; and no episodes of decompensation

(Docket Entry No. 7, p. 24)(internal references to the record omitted)

### d. The ALJ's Step-Five Determination

"Considering the whole of th[e] evidence, in light of the claimant's limitations and using the above-cited rules as a framework," the ALJ determined that "it [wa]s clear that the claimant remain[ed] capable of performing jobs which exist in significant numbers in the national economy." (Docket Entry No. 7, p. 25) The ALJ concluded that, based on plaintiff's RFC, she "[wa]s not disabled." (Docket Entry No. 7, p. 25)

### e. The ALJ's Final Determination

Having determined at step five that the plaintiff's RFC would permit her to work, the ALJ concluded that:

> based on the application filed on March 14, 2001, with a protective filing date of February 27, 2001 and March 14, 2001, with a protective filing date of February 27, 2001, the claimant is not entitled to a period of disability or disability insurance benefits under Sections 216(i) and 223, respectively, of the Social Security Act, and is not eligible for supplemental security income under sections 1602 and 1614(a)(3)(A) of the Act.

(Docket Entry No. 7, p. 27) The ALJ also concluded that the plaintiff was "not disabled on the basis of the subsequent applications filed April 16, 2004 and April 19, 2004." (Docket Entry No. 7, p. 27)

### III. Claims of Error

### A. Whether the Commissioner Erred in Failing to Understand the True Nature of Fibromyalgia

The plaintiff argues in her first claim of error that the ALJ failed to consider properly the

21

impact of fibromyalgia on her ability to work. (Docket Entry No. 12, pp. 12-17) The crux of the plaintiff's argument is that the ALJ "focused on the lack of objective medical evidence in the record," and that he failed to understand that subjective complaints of fibromyalgia can form the basis for a disability claim. (Docket Entry No. 12, pp. 12-13, 17)

Taking the last point first, there is nothing in the record that supports the plaintiff's claim that the ALJ failed to understand that subjective complaints of fibromyalgia can form the basis of a disability claim. On the contrary, as discussed above at pp. 10, 12, the ALJ demonstrated his understanding that fibromyalgia can form a basis for a disability claim when he determined at step two that the plaintiff suffered from several severe impairments, including fibromyalgia, that affected her ability to work. A diagnosis of fibromyalgia, however, is not conclusive. The ALJ was obliged to determine at step five whether the plaintiff's RFC in view of her fibromyalgia would permit her to work. The ALJ's step-five determination that the plaintiff had the RFC to work is not the same thing as failing to understand that subjective complaints of fibromyalgia can form the basis of disability.

The plaintiff's claim that the ALJ "focused on the lack of objective medical evidence in the record" appears to have two parts: first, that the ALJ improperly based his final determination on the lack of objective medical evidence in the record; and second, that the ALJ mistakenly "concluded that [the plaintiff] exaggerated her symptoms and their effect on her ability to perform daily activities, and that her physicians based their opinions on her 'exaggerated symptoms.'" The gist of the second part is that the ALJ erred in determining that the plaintiff's claims were not credible.

Although the ALJ does, in fact, make a passing reference in his decision that the plaintiff's limitations exceeded what could reasonably be expected in light of the minimal objective findings

(Docket Entry No. 7, pp. 21-22), the plaintiff does not argue, nor can it be inferred from the plaintiff's memorandum of law, that the ALJ's consideration of the lack of objective medical evidence was determinative. The ALJ's opinion is clear on its face that the determinative consideration was not the absence of objective medical evidence; rather the determinative consideration was the plaintiff's lack of credibility.

The plaintiff further argues that the ALJ erred in determining that her claims were not credible. In assessing the plaintiff's credibility, the ALJ first considered her testimony at the hearing about her daily activities. An ALJ may consider evidence of a claimant's daily activities in determining that a claimant's testimony is not credible. *See Walters v. Commissioner*, 127 F.3d 525, 531-532 (6th Cir. 1997). Although he ALJ is not required to credit the claimant's testimony, *see Jones*, 336 F.3d at 475-476, the ALJ must provide some explanation for rejecting a claimant's testimony when, as here, the medical evidence establishes an impairment that could reasonably be expected to cause disabling pain, *see Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989); *see also Felisky*, 35 F.3d at 1036; *Hurst*, 753 F.2d at 519.

As discussed above at pp. 12-13, the ALJ determined that there were inconsistencies and/or contradictions in the plaintiff's testimony between her claimed restrictions and her admitted activities. The ALJ noted that the plaintiff was able to do light house work, work on her computer, run errands, shop for groceries, and take two-hour excursions with her mother – all of which exceeded the 15- to 20-minute threshold after which, by her testimony, her pain became unmanageable. (Docket Entry No. 7, p. 21). The ALJ also concluded that "[t]he shopping trips contain more prolonged standing, walking and sitting than would be permissible if her complaints were fully credible." (Docket Entry No. 7, p. 21 n. 1). The transcript of the hearing supports the

23

ALJ's conclusion with respect to the conflicts/inconsistencies in the plaintiff's testimony. (Docket Entry No. 7, pp. 656, 658-659) Based on the foregoing, the ALJ determined that the "claimant's subjective complaints are not credible to the extent alleged." (Docket Entry No. 7, p. 21) An ALJ may reject testimony of disabling pain when that testimony is inconsistent with the claimant's own admitted daily activity. *See Siterlet v. Secretary of H.H.S.*, 823 F.2d 918, 921 (6th Cir. 1987).

The ALJ also referred to medical records in determining that the plaintiff's claims were not credible. The ALJ referred to the records of Dr. Keown, discussed above at pp. 16-17, who described the plaintiff in July, 2001 as quick, very agile, talkative and friendly, and with no problem "ambulating" through the clinic, or getting on and off the examining table. Dr. Keown also noted that the plaintiff had full range of motion in her joints, and exhibited no evidence of traditional trigger points. Dr. Keown made her observations approximately 5 months after the plaintiff first filed for DIB and SSI in 2001.

The ALJ referred to the records of Dr. Jenkins, discussed above at p. 13, who examined the plaintiff in September, 2001, seven months after she filed her claims for DIB and SSI. Dr. Jenkins observed that the plaintiff "showed 'exaggerated pain behavior' and did not have the 'classic trigger points' for fibromyalgia."[12]

---

[12] Curiously, the ALJ did not refer to the following observations of Dr. James B. Millis made on December 19, 2001:

> Claimant is a 50-year old female alleging disability due to fibromyalgia... [S]he reports as agile, and moving freely through [the] office, getting up and down from [the] examination table easily and ambulating without difficulty there [a]re no positive trigger points. At office visit with primary care physician 8/15/01, she had exaggerated pain behavior. but no trigger points At follow-up visits 9/10/01, she again had markedly exaggerated pain responses Claimant's complaints of pain are not fully credible.

(Docket Entry No. 7, p. 528)(underlining omitted) It is apparent from the record that Dr. Millis is referring to the treatment provided by Dr. Jenkins, discussed above at p. 13

The ALJ referred to the records of Dr. Johnson, discussed above at p. 13. Dr. Johnson noted in June, 2003 that the plaintiff exaggerated her symptoms, and that she pretended to fall after twice deliberately kicking over a stool when she was asked to get on the examining table.

The ALJ referred to the records of Dr. Smith, discussed above at p. 17. Dr. Smith noted in May, 2004 that the claimant retained full range of motion in her joints, had no sensory, reflex or neurological abnormalities, noted that her gait was normal, and made no mention of trigger point tenderness.

The records of each of the above-named doctors support the ALJ's determination that the plaintiff's claims were not credible. The plaintiff argues, however, that the records of her treating physicians should be accorded greater weight than the observations of these other physicians. For reasons discussed herein, the undersigned disagrees.

The above-named doctors all appear to have been consulting physicians.[13] These doctors nevertheless made four independent observations of the plaintiff at four different points on the plaintiff's alleged disability time-line. The opinions of these four doctors were supported by objective medical evidence. Thus, they constitute substantial evidence upon which the ALJ could rely. Moreover, as the ALJ correctly noted, the plaintiff's treating physicians made no effort to assess the plaintiff's credibility. *See* discussion at pp. 15-16, *supra*. Thus, the issue is whether the ALJ erred in his credibility determination – not whether the ALJ gave appropriate weight to the opinions of the treating physicians. The treating physicians did not assess the plaintiff's credibility, and there is substantial evidence in the record to support the ALJ's determination that the plaintiff's

---

[13] As noted above at n. 12, Dr. Millis characterized Dr. Jenkins as the plaintiff's "primary care physician." The record shows, however, that Dr. Jenkins only treated the plaintiff twice.

25

claims were not credible. An ALJ's credibility finding is entitled to great deference, if it is supported by substantial evidence. *See Warner v. Commissioner*, 375 F.3d 387, 392 (*citing Walters*, 127 F.3d at 531)); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001)(fibromyalgia case). The ALJ's credibility determination must stand.

## B. Whether the Commissioner Erred as a Matter of Law in not According Adequate Weight to the Opinions of the Plaintiff's Treating Physicians

The plaintiff argues in her second claim of error that the ALJ erred in the weight that he assigned to the opinions of treating physicians, Drs. Seitzinger and Dr. Turek, discussed above at pp 15-16. More particularly, the plaintiff asserts that the ALJ erred because he: 1) gave Dr. Seitzinger's opinion "little, if any, weight" (Docket Entry No. 12, pp. 20, 28); 2) gave Dr. Turek's opinion "little, if any, weight" (Docket Entry No. 12, pp. 22, 28-29); 3) did not consider CFR § 404.1527(d) in determining what weight to accord to the opinions of Drs. Seitzinger and Turek (Docket Entry No. 12, pp. 24-25, 29); 4) substituted his own opinion of the plaintiff's RFC in the absence of any medical evidence to support his decision (Docket Entry No. 12, p. 27); and 5) did not substantiate his rejection of the opinions of Dr. Seitzinger and Turek as to the plaintiff's RFC as required by SSR 83-10 (Docket Entry No. 12, p. 27).

### 1. Dr. Seitzinger's Opinion

The ALJ gave Dr. Seitzinger's opinion "little, if any, weight" because: 1) the Medical Source Statement (source statement) completed by Dr. Seitzinger on July 29, 2004 (Docket Entry No. 7, pp 202-205) documented impairments that were not supported by his records, *i.e.*, susceptibility to pulmonary irritants, problems manipulating objects, and sensitivity to noise, vibration or extremes of humidity or temperature (Docket Entry No. 7, pp. 204-205); 2) the source statement documented

26

impairments that the plaintiff had not alleged; 3) the limitations exceeded what could be reasonably be expected in the light of the minimal objective findings; 4) the limitations appeared to give the plaintiff full credibility for her complaints; 5) the limitations were not consistent with the plaintiff's admitted activities; 6) there were no x-rays to confirm arthritic changes; and 7) there were no tests to support his conclusion that the plaintiff had carpel tunnel syndrome.[14] (Docket Entry No. 7, p. 23)

There is nothing in Dr. Seitzinger's records that shows the plaintiff ever complained to him that her impairments were exacerbated by pulmonary irritants, noise, vibration, exposure to extremes of temperature and/or humidity, or that her fibromyalgia caused problems with her ability to manipulate objects.[15] There also is nothing in Dr. Seitzinger's records that shows he assessed the plaintiff's susceptibility to these factors during the nearly three years that he treated her, independent of her actual complaints or otherwise.

The record also shows that the plaintiff did not allege in the disability proceedings that she was affected by the factors identified above. When the plaintiff was asked at the hearing to explain how, and under what circumstances, her fibromyalgia affected her, the plaintiff testified within the context of the factors identified above only that she had "more bad days in this type of weather and the winter months . . ." (Docket Entry No. 7, p. 658) The plaintiff made no mention of any of the factors identified by Dr. Seitzinger in the source statement. Additionally, a comparison of the

---

[14] The undersigned has not found any evidence in the source statement that Dr. Seitzinger was of the opinion that the plaintiff had problems with arthritis and/or carpal tunnel syndrome. Neither has the undersigned found such evidence elsewhere in Dr. Seitzinger's records. As will become apparent, it is not necessary to address these two points in resolving this issue.

[15] In the source statement, Dr. Seitzinger checked the boxes indicating that the plaintiff was limited in her ability to reach, handle, finger, feel because of "soft tissue muscle pain[,] numbness, and tingling." (Docket Entry No. 7, pp. 204-205) Dr. Seitzinger also checked the boxes corresponding to the following environmental limitations: temperature extremes, noise, dust, vibration, humidity/wetness, machinery and height-related hazards, fumes, odors, chemicals, and gases. (Docket Entry No. 7, p. 205)

27

hearing transcript and the source statement reveals that Dr. Seitzinger's opinion was inconsistent with the plaintiff's admitted activities. Therefore, it was entirely appropriate for the ALJ to conclude that Dr. Seitzinger credited the plaintiff's complaints without question. Moreover, it is clear from the ALJ's statement that Dr. Seitzinger "mentioned fibromyalgia, depression and anxiety in his treatment records ... with multiple trigger points" that the ALJ considered Dr. Seitzinger's records in their entirety before discounting some of his opinions.

The record shows that Dr. Seitzinger saw the plaintiff numerous times between September 17, 2001 and July 1, 2004. (Docket Entry No. 7, pp. 102-111, 193-205, 526-527, 564-571) In the thirty-three pages of Dr. Seitzinger's records, there are only six entries in which the plaintiff "presented" herself for fibromyalgia pain: March 13, June 6, July 3, September 5, and November 11, 2002, and again on August 27, 2003. (Docket Entry No. 7, pp. 107, 565-567) In each instance, Dr. Seitzinger observed only generally that the plaintiff had come to see him for fibromyalgia pain, and that eleven of sixteen trigger points were positive. Not once, however, did Dr. Seitzinger characterize the plaintiff's fibromyalgia symptoms as "mild," "moderate," or "serious," or in any other terms from which the severity of the plaintiff's condition might be inferred.

Dr. Seitzinger completed a Medical Source Statement on July 29, 2004, setting forth his opinion as to the plaintiff's functional limitations. (Docket Entry No. 7, pp. 203-205) The record reveals, however, that prior to completing that source statement, Dr. Seitzinger had not treated the plaintiff for fibromyalgia pain for nearly a year. Moreover, the source statement completed by Dr. Seitzinger consists of checks placed in boxes – or not – and an occasional cryptic/conclusory note.[16]

---

[16] Dr. Seitzinger wrote the following explanatory notes in the source statement: "occasionally cane," "don't know re: lower but can't bicycle," "soft tissue muscle pain & spasm," "gives pain relief," "soft tissue muscle pain,' and "soft tissue muscle pain and tingling." (Docket Entry No. 7, pp. 203-205)

The remainder of Dr. Seitzinger's records shed no light on those aspects of the plaintiff's condition that were before the ALJ. Some of these other treatment records pertain to a range of problems including: chest pain, dysuria (painful urination), dyspnea (shortness of breath), cold/flu-like symptoms, etc. The remaining records consist of requests for/reports of laboratory tests for Rocky Mountain Spotted Fever, thyroid problems, pap smears, etc.

Finally, in rejecting Dr. Seitzinger's opinion, the ALJ referred to the records of those physicians previously discussed above at pp. 13-14, 16-17, 24-25, all of whom treated the plaintiff during the same time frame as Dr. Seitzinger. As discussed previously, the observations of these four different doctors contradict Dr. Seitzinger's medical opinion.

A treating physician's opinion is accorded deference when supported by objective medical evidence. *See* 20 C.F.R. §§ 404.1527(d)(2)-(4); 416.927(d); *Rogers*, 486 F.3d at 242 (fibromyalgia case); *Warner*, 375 F.3d at 390 (*citing Jones*, 336 F.3d at 477)). An ALJ may also consider the question of credibility, however, and "great deference" is accorded to such determinations. *See Warner*, 375 F.3d at 392 (*citing Walters*, 127 F.3d at 531)); *Buxton*, 246 F.3d at 773 (fibromyalgia case). The ALJ may reject a treating physician's opinion when the ALJ articulates good reasons for not accepting it. *See Rogers*, 486 F.3d at 242. *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988). Moreover, the ALJ is not bound by a treating physician's conclusory views of a claimant's maximum RFC. *Buxton*, 246 F.3d at 773 (fibromyalgia case).

For all the foregoing reasons, substantial evidence in the record supports the ALJ's determination to give Dr. Seitzinger's medical opinion "little, if any, weight."

## 2. Dr. Turek's Opinion

The ALJ also gave Dr. Turek's opinion "little, if any, weight." It is apparent from the ALJ's

29

decision that he largely disregarded Dr. Turek's opinion because: 1) he erroneously asserted that the plaintiff suffered from "malnutrition"; 2) his statements were conclusory, and unsupported by the treatment records; 3) his limitations were inconsistent with the plaintiff's admitted activity; 4) his opinion gave full credence to the plaintiff subjective complaints of symptoms and limitations; 5) there were no x-rays confirming any significant arthritic changes; and 6) no tests were performed to substantiate his assertion that the plaintiff had carpal tunnel syndrome.[17] (Docket Entry No. 7, p. 22) These points will be discussed below.

On October 28, 2002, Dr. Turek determined that the plaintiff was malnourished, noting that she weighed 98 pounds. (Docket Entry No. 7, p. 546) On March 27, 2003, Dr. Turek again noted that the plaintiff suffered from "[m]alnutrition," noting that she weighed 108 pounds. (Docket Entry No. 7, pp. 560-562) Dr. Turek reported on March 15, 2004 that the plaintiff suffered from "malnutrition," without providing her weight (Docket Entry 7 p. 173) Finally, Dr. Turek determined in his June 10, 2004 medical evaluation that the plaintiff was "malnourished," again without providing her weight. (Docket Entry No. 7, p. 143)

In his medical records, Dr. Turek noted that the plaintiff was 5' 1" (61") tall.[18] A 61-inch tall woman is considered malnourished when she weighs 84 pounds or less, unless additional, specific "abnormal findings" are established "on repeated examinations," in which case a 61-inch tall woman is considered malnourished when she weighs 89 pounds. 20 C.F.R. § 404, Sub.Pt. P. App 1, § 5.08,

---

[17] The undersigned has not found any evidence in record that Dr. Turek was of the opinion that the plaintiff had problems with arthritis or carpal tunnel syndrome. Once again, it is not necessary to address these two points in resolving this issue

[18] The record shows that the ALJ mistakenly converted the plaintiff's height of 5'1" noted in Dr. Turek's March 27, 2003 examination of the plaintiff (Docket Entry No. 7, p. 562) to 59.5" A height of 5'1" actually converts to a height of 61".

Tables II and IV. As the ALJ correctly noted, the plaintiff was not malnourished at either weight. (Docket Entry No. 7, p. 22)

Dr. Turek's use of the term "malnourished" was conclusory and inconsistent with the definition set forth in the Regulations, and his diagnosis was not supported by any actual testing or by any other physicians.[19]

The record supports the ALJ's determination that the physical restrictions determined by Dr. Turek were conclusory, and not supported by treatment records. (Docket Entry No. 7, pp. 142-144, 172-182, 546-548, 557-563) Indeed, Dr. Turek's medical records are devoid of any facts and/or explanations that bridge the gap from recording the plaintiff's recitation of her subjective complaints to Dr. Turek's subsequent determination of impairment. The conclusory nature of Dr. Turek's records supports the ALJ's further determination that Dr. Turek gave unquestioned credence to the plaintiff's subjective complaints.

The record also shows that the ALJ was correct in determining that the physical limitations opined by Dr. Turek were more restrictive than the plaintiff's admitted activities.

Finally, the ALJ took into consideration the medical observations of Drs. Smith, Keown, Jenkins, and Johnson. For the reasons previously explained, the opinions of these four doctors, whose observations spanned Dr. Turek's treatment of the plaintiff, are inconsistent with his opinions. Thus, substantial evidence supports the conclusion that the ALJ had good reason to give Dr. Seitzinger's medical opinion "little, if any, weight."

---

[19] Although the ALJ made no mention of it, Dr. Seitzinger, whose own treatment of the plaintiff overlapped Dr. Turek's, did not diagnose the plaintiff as malnourished during the time that he treated her.

31

### 3. Analysis Under CFR § 404.1527(d)

The plaintiff asserts that the ALJ did not consider the factors contained in 20 CFR § 404.1527(d). (Docket Entry No. 12, pp. 24-25, 29). The rule at issue pertains to how medical opinions are weighed.

The plaintiff does not provide any authority to support her claim that the ALJ is somehow required to make specific reference to § 404.1527(d) in his opinion, and/or that the ALJ is required to do a by-the-step analysis/determination of each point in the rule, *i.e.*, the examining relationship, the treatment relationship, supportabilty, consistency, specialization, and other factors. The rule itself provides only that the ALJ will "always give good reasons in [the] notice of determination or decision for the weight . . . give[n] [the] treating source's opinion." *Id.* at § (d)(2).

The ALJ did not cite § 404.1527(d) in his decision, nor did he address/consider each of the six factors in § 404.1527(d) separately. It is apparent, however, from his decision that the ALJ addressed the factors under § 404.1527(d), and that his decision was consistent with the Regulation. The ALJ's decision demonstrates that the ALJ had, and gave, "good reasons" for discounting the opinions of the plaintiff's treating physicians, and that his decision is supported by substantial evidence in the record.

### 4. Residual Functional Capacity Determination

The plaintiff alleges next that the ALJ applied his own RFC to the plaintiff in the absence of any medical evidence to support his decision. (Docket Entry No. 12, pp. 26-27). The record does not support this claim. Specifically, having determined that the opinions of Drs. Seitzinger and Turek were entitled to "little, if any, weight," the ALJ relied on the opinions of Drs. Smith, Keown, Jenkins, and Johnson, discussed above at pp. 13-14, 16-17, 24-25, in establishing the plaintiff's

32

maximum RFC. The ALJ's determination of the plaintiff's maximum RFC is supported by substantial evidence in the record.

### C. Whether the Commissioner Erred as a Matter of Law in Failing to Consider the Effect of the Plaintiff's Fibromyalgia on Her Ability to Work

In her third claim of error, the plaintiff argues that the ALJ: 1)"failed to properly analyze her subjective signs of fatigue, muscle aches, pain, memory loss, and other symptoms of fibromyalgia on her ability to work" (Docket Entry No. 12, p. 30); 2) erred in determining that her "subjective complaints [we]re not credible to the extent alleged," and that her complaints far exceeded what could be reasonably expected in the light of objective findings" (Docket Entry No. 12, p. 31); 3) erred in rejecting the plaintiff's "subjective complaints and symptoms based on the erroneous conclusion that [her] allegations of pain and fatigue were inconsistent with her reported activities" (Docket Entry No. 12, p. 32); 4) "mischaracterized her daily activities" (Docket Entry No. 12, p. 32); 5) "misinterpreted and mischaracterized the evidence in finding that [her] subjective complaints [we]re not credible to the extent alleged" (Docket Entry No. 12, p. 34); 6) "failed to make appropriate findings as to [her] subjective complaints of fatigue, muscle aches, pain, memory loss, and other symptoms of fibromyalgia and his reasons for rejecting these complaints" (Docket Entry No. 12, p. 34); and 7) failed to "articulate reasons for discrediting subjective symptom testimony."

This third claim of error is essentially indistinguishable from the plaintiff's first two claims of error. Each of the arguments enumerated above has been addressed within the context of the plaintiff's first two claims of error, and subsumed within the analysis related thereto. Consequently, this claim of error is without merit.

33

### D. Whether the Commissioner Erred as a Matter of Law
### in Failing to Comply with the Appeals
### Council's Order of Remand

The crux of the plaintiff's fourth claim of error is that the ALJ failed to comply with the

Appeals Council's order of remand, because he did not evaluate the plaintiff's mental impairment

in accordance with the Appeals Council's specific instructions. The plaintiff appealed the ALJ's

decision that is the subject of this action to the Appeals Council on May 20, 2005. (Docket Entry

No. 7, pp. 14-15) The appeal was denied. (Docket Entry No. 7, pp. 8-10)

The scope of the district court's review authority is to determine whether the Commissioner's

findings of fact are supported by substantial evidence in the record, and whether the correct legal

standards were applied. Because the district court does not review internal, agency-level

proceedings, it will not address whether the ALJ complied with the specific provisions of the

Appeals Council's order of remand. *See e.g., Dyer v. Secretary of H.H.S.*, 889 F.2d 682, 684 (6th Cir.

1989); *Duda v. Secretary*, 834 F.2d 554, 555 (6th Cir. 1987); *Kastman v. Barnhart*, 2002 WL

1461499 (6th Cir. (Ill.)). This claim is without merit.

### IV. CONCLUSION

The ALJ applied the proper legal standards in his decision, and his findings of fact,

conclusions of law, and final determination are supported by substantial evidence in the record.

### V. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that the plaintiff's

motion for judgment on the administrative record be **DENIED**, and that the Commissioner's

decision be **AFFIRMED**.

The parties have ten (10) days of being served with a copy of this Report and

34

Recommendation, to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this Report and Recommendation within ten (10) days after being served with a copy thereof. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

E. Clifton Knowles
Magistrate Judge

35